CASE 51—PETITION—NOVEMBER 26.

## Goss, &c., v. Froman, &c.

APPEAL FROM LOUISVILLE LAW AND EQUITY COURT.

1. CHILD BORN IN WEDLOCK PROVED ILLEGITIMATE.—Where husband and wife have had opportunities of access, there arises a strong presumption, upon an issue as to the legitimacy of a child begotten in wedlock, that they have had such access; but this presumption may be overcome by clear proof to the contrary, as that the husband was incompetent, or from some cause declined to have sexual intercourse with his wife, or she with him; and upon this issue the conduct and declarations of the parties while they lived together, apparently as husband and wife, are competent evidence.

2. SAME.—Where the husband's access about the time the child was begotten is expressly or impliedly admitted or is proved, the child's illegitimacy can not be established by the mere weight of evidence; nothing short of some fact thoroughly established, and which can not be explained away, as the case of a white woman with a white husband having a negro child, will be allowed to prevail against the presumption of the child's legitimacy in such a case.

3. SAME.—Where access is expressly or impliedly admitted, proof of the wife's adultery is ordinarily inadmissible, unless it is such proof as unquestionably establishes the fact of illegitimacy, as that of the adulterous intercourse of a white woman, having a white husband, with a negro, and the birth of a negro child in the usual course of time thereafter; but where the proof shows that the husband was not capable of performing the sexual act, or that the parties abstained from doing so, then it is competent to prove adultery on the part of the wife as corroborating the main fact.

4. WIFE'S DOWER BARRED BY LIVING IN ADULTERY.—The statute,

which provides that if the wife voluntarily leaves her husband, and lives in adultery, she shall forfeit her dower and distributable share in her husband's estate, does not mean that such a forfeiture shall take place only in the event she shall constantly live with one man in adultery during her abandonment. If she admits any man or men to her periodically, or whenever it is convenient or opportunity is afforded during said abandonment, such conduct constitutes a living in adultery within the meaning of the statute.

**THOMAS H. HINES, JOHN M. WILKINS** FOR APPELLANTS.

1. On the issue of the legitimacy of a claimant to heirship, any evidence that tends to establish illegitimacy is competent. That evidence may be as to the impotency of the husband, non-access by the husband, or any other fact or circumstance conducing to show that the husband is not the father of the child. (Radwell's case, Rolle's Abridgment, 356; Wright v. Hicks, 12 Ga., 155; s. c., 56 Am. Dec., 451; Wright v. Hicks, 15 Ga., 160; s. c., 60 Am. Dec., 687; Pindrill v. Pindrill, 2 Strange, 925; Bosville v. Attorney-General, 36 Albany Law Journal, 295; Gen. Stats., chap. 113, sec. 24.)

2. Section 7 of chapter 31, General Statutes, is a statute of limitation, and in effect provides that the presumption of legitimacy *shall cease* at the expiration of ten months, but it in no way destroys the right to prove illegitimacy when the birth occurs within that time.

**ABBOTT & RUTLEDGE** ON SAME SIDE.

1. While the law presumes a child born in wedlock to be legitimate, this is but a *prima facie* presumption of fact, which may be rebutted by evidence, and proved or disproved, as any other fact. It is not essential to establish the *impossibility* of the husband being the father of the child in order to establish a plea of illegitimacy, but such facts and circumstances as will induce a rational and satisfactory belief in the mind of the court or jury is sufficient. (Pindrill v. Pindrill, 2 Strange, 925; Nicholas on Adulterine Bastardy, pp. 134, 182; Hawes v. Drager, 3 L. R. (Ch'y), 178; Morris v. Davis, 14 Eng. Com. L. R., 227; Schuler v. Bull, 15 S. C., 428; Wilson v. Babb, 18 S. C., 69; State v. Shumpert, 1 S. C., 85; Steele v. Petteway, 3 Hawks (N. C.), 625; Commonwealth v. Wentz, 1 Ashmore, 27; Wright, &c., v. Hicks, &c., 12 Ga., 161; Cannon, &c., v. Cannon, &c., 7 Humph., 410.)

Cases commented on: Strode v. Magowan's Heirs, 2 Bush, 621 Darnelli v. Darnelli, 4 Bush, 51; Remmington v. Lewis, 8 B. M., 611.

2. The provisions of the General Statutes relied upon by counsel for appellees have no application to this case. (Gen. Stats., chap. 31, sec. 7; chap. 7, secs. 1, 2.)

3. Neither husband nor wife is a competent witness as to access or non-

access. (Civil Code, sec. 606; Boyken v. Boyken, 70 N. C., 262; Patchett v. Holgate, 3 Eng. L. & Eq., 100; King v. Lourton, 31 Eng. C. L. R., 312; Hamp v. Robinson, 16 Law Times, 29; Aylesford Peerage Case, 14 L. R., 1.)

4. Proof of the wife's adultery was competent. (Cannon, &c., v. Cannon, &c., 7 Humph., 410; Aylesford Peerage Case, 14 L. R., 1; Nicholas on Adulterine Bastardy, 131.)

5. The letters written by Mrs. Froman to Ed. Ward were competent evidence as part of the wife's conduct. (Gipps v. Gipps, 11 House Lords Cases, 1; Aylesford Peerage Case, 14 L. R., 1.)

BURTON VANCE, BROWN, HUMPHREY & DAVIE of counsel on same side.

HELM & BRUCE for appellees.

1. The Kentucky statute conclusively presumes every child to be legitimate that is born in lawful wedlock, or within ten months after the death of the husband. (Gen. Stats., chap. 7, secs. 1, 2; Revised Statutes, chapter on Bastardy, sec. 1; Acts 1865, vol. 1, p. 134; Gen. Stats., chap. 31, sec. 7.)

2. By the common law, a child begotten or born in lawful wedlock is presumed to be legitimate, unless its illegitimacy be established *beyond all reasonable doubt.* (Greenleaf on Evidence, vol. 1, sec. 28; Abbott's Trial Evidence, sec. 32; Egbert v. Greenwalt, 44 Mich., 245; Bowles v. Bingham, 3 Munf. (Va.), 601; Van Arnam v. Van Arnam, 1 Barb. Ch'y, 375; Mink v. State, 60 Wisc., 685; Warlick v. White, 76 N. C., 175; Commonwealth v. Shepherd, 6 Binney (Pa.), 286; Sullivan v. Hughey, 32 Ga., 322; Darnelli v. Darnelli, 4 Bush, 60; Head v. Head, 1 Sim. & Stew., 153; Buray v. Philpot, 2 Mylne & Keene, 349.)

Cases explained: Remington v. Lewis, 8 B. Mon., 606; Commonwealth v. Wentz, 1 Ash. (Pa.), 271; State v. Pettaway, 3 Hawks (N. C.), 623; Wilson v. Babb, 18 S. C., 59; Cannon v. Cannon, 7 Humph.; Wright v. Hicks, 15 Ga., 160.)

3. Medical authorities as to period of gestation, &c. (Wharton & Stille's Med. Jur., vol. 3, secs. 45, 47, 52, 53; Roberts on Urinary & Renal Diseases, p. 404.)

4. The statute fixes the period of gestation at ten months. (Gen. Stats., chap. 31, sec. 7.)

5. The court did not err in refusing to transfer the case to the common law docket. (Civil Code, secs. 10, 12, 312, 313; Blakey v. Johnson, 13 Bush, 200; Kennedy v. Ten Broeck, 11 Bush, 254; Baltzell v. Hall, 1 Litt., 98; Edelen v. Barker, 8 Ky. Law Rep., 268; Bailey v. Nichols, 8 Ky. Law Rep., 64; Hendricks v. Money, 1 Bush, 309; Moore v. Payne, 7 Dana, 380; Lea v. Beatty, 8 Dana, 207.)

6. While neither husband nor wife will be permitted to *bastardize* the issue of the wife, either is competent to prove the *legitimacy* of such issue. (Chamberlain v. Commonwealth, 28 N. Y., 85; Moseby v. Eakin, 15 Rich. (S. C.), 324; Warlick v. White, 76 N. C., 175.)

The case of Boykin v. Boykin, 70 N. C., explained.

SAME COUNSEL IN PETITION FOR REHEARING.

The facts necessary to work a forfeiture of dower were never pleaded except by Elizabeth Wilson, and she is not affected by the allotment of dower, as it does not touch the property devised to her. Moreover, the evidence fails to establish either that "the wife voluntarily left her husband," or that she "lived in adultery." (Gen. Stats., chap. 52, art. 4, sec. 3.)

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

Minnie R. Froman is the widow of Solomon Froman, deceased. He died testate on the third day of June, 1884. Solomon White Froman, son of Minnie R. Froman, was begotten during the wedlock of Solomon Froman and Minnie R. Froman, and was born on the third day of January, 1884, about seven months after the death of the putative father, Solomon Froman.

Solomon Froman's will made no provision for this after-born child, nor any provision for Minnie R. Froman, the widow. Solomon White Froman claimed the entire estate, under the statute, as an after-born, pretermitted child. The widow renounced the provisions of the will, and claimed her dowable and distributable share of the estate. Issue was joined as to the legitimacy of Solomon White Froman and as to the forfeiture of the widow's dowable and distributable interest by reason of her abandoning her husband, Solomon Froman, and living in adultery. These issues were decided against the devisees under the will, and they have appealed to this court.

It is to be regretted that questions like these should ever arise in the courts of this Commonwealth. Kentucky's matrons are famed for their high sense of virtue and exemplary conduct, and it is to be regretted that the conduct of Mrs. Minnie R. Froman was so radical a departure from this fair fame as to impel us to declare her son, Solomon White Froman, illegitimate.

The proof is, that Mrs. Froman left the house of her husband, Solomon Froman, on the morning of the fourth of April, 1884, and went direct to Bowling Green, to the house of a Mrs. Wilson, where she remained at least a week, and then returned to Louisville, and took boarding with a certain woman, and there remained as boarder until the death of her husband, never visiting or seeing her husband after she left his house on the fourth of April preceding, although she left him sick of a fatal disease, of which he died on the third of June.

Mrs. Froman claims that her husband, Solomon Froman, on the morning of the third of April—the day before she left his house—sent for her to come to his room. She went, and he then had sexual intercourse with her, getting her with child. If this story is to be believed, the appellee, Solomon White Froman, having been thereafter born within the usual time of gestation, is the child of Solomon Froman. But is the story to be believed? Does not the proof disclose a state of case that utterly repels the truth of this story? Does not the proof show a state of case that repels any presumption of sexual intercourse whatever? We think it does. Let us see. We find that

Solomon Froman, on the eleventh day of November, 1883, was afflicted with Bright's disease and the dropsy of the bowels, scrotum and thighs. Dr. Griffith attended on him almost daily, and treated him for these diseases until the seventh day of January, 1884, at which time he turned the case over to Dr. Holloway, and he attended on Froman almost daily, and treated him for these diseases until his death. Froman continued to grow worse from the time Dr. Griffith commenced attending on him until he died. That his condition may clearly appear, we quote from Dr. Holloway's testimony, which is as follows:

"He had œdema of the lungs, or asthmatic breathing, and frequent paroxysms of asthma, excessive bronchiæ. He had general dropsy. This dropsy was more generally displayed by the accumulation in his abdomen, by enlargement of the skin, by the dropsy of the skin of the abdomen, and the loins, back and thighs, of the skin of the thighs and legs, and by the general excessive accumulation of fluid in the scrotum and in the skin of the penis, so much so that the penis proper could not be seen upon an examination, only the orifice. He had frequent attacks of vomiting and obstinate constipation, with loss of appetite. He was mentally dull, unless when aroused by some special cause of excitement. He had what is called hebetude. With or without anodynes he aroused at my visits in a sleepy way in his bed or chair, and had to be questioned before he would give any answer about his case. When aroused by any special cause of excitement he was more talkative, but confined himself to the subject that excited him,

and then when that passed away he would relapse into his condition of hebetude. His urine was very scant, and when boiled with nitric acid it had the appearance of soiled boiled white of an egg. His case was plainly one of Bright's disease in its advanced stages. This was his condition when I saw him in January, 1884. The dropsical condition of the penis and scrotum got steadily worse from the first time I saw him. Only the orifice of the skin where the penis was could be seen. He could not have had sexual intercourse from the time I saw him in January, 1884. In his physical condition it was not possible for him to have emitted semen into a woman. It was not possible for him to have had connection with a woman at any time during my attendance upon him. The usual period of gestation is from 273 days to 280 days."

In his second deposition he says:

"I am satisfied that he was not physically capable of performing the sexual act. I do not think that it was possible for him to enter a woman so as to bring the semen in the track in such a manner that the spermatazoa could find their way to the ova. I visited him from the 3d to the 9th of February, excepting the 8th; then from the 10th to the 15th, excepting the 14th. I visited him the 17th, 19th, 20th, 21st, 23d, 25th, 27th, and 1st of March; then 4th and 7th of March, twice that week; then the 11th of March, once that week; then the 16th, 21st, 22d, 23d and 27th of March; then 31st of March and 8th and 11th of April; then 16th and 19th of April; then 23d and 27th of April, and 3d of May, 6th of May and

10th of May.    Then I visited him on the 11th, 13th, 14th, 15th, 16th of May, and the 19th, 20th, 21st, 22d, 23d, and on the 24th; twice on the 25th to the 31st, inclusive, twice every day; twice on the 1st of June and twice on the 2d of June, the day of his death.''

From what Dr. Holloway says, it was a physical impossibility for Solomon Froman to get his wife with child at the respective dates that he visited him.    Is it possible that the swelling could have abated, between the 31st of March and the 8th of April, enough to enable him to have sexual intercourse at any time during said period?    It may be possible; but it seems to us that such a conclusion is wholly irrational.    The doctor, in his almost daily visits, before and after said time, found him so swollen as to be incapable of performing the sexual act, and growing worse all the time; so it seems that there is no ground whatever for forming any rational conclusion that the swelling so abated within said time as to enable him to have had sexual intercourse.    Such a conclusion would be wholly irrational; but we are not left to conjecture about the matter, for the nurse, who was in daily attendance upon Soloman Froman, and slept with him nightly during said time, says that his swelling did not abate, nor did his condition at all improve.    He also says that he knows Soloman Froman did not have sexual intercourse with Mrs. Froman on the morning of the 3d of April, nor at any other time for several months previous.    It also appears that Solomon and Mrs. Froman lived like cats and dogs for several months prior to her leaving his house on the 3d of April; that he usually spoke of her as the

"damned dirty bitch," and she of him as "the damned old son of a bitch." He accused her of poisoning him, and she said that she had poisoned him in order to get him out of the way. She also said, time and again, he could not, even before he was taken sick, have sexual intercourse; that she and he had ceased, for at least a year before his death, to have intercourse with each other. He said the same thing. It also appears from the proof that she had sexual intercourse with Ed. Ward, in Bowling Green, on the night of the 4th of April, and several other times during her stay in that city, and afterwards with another. It also appears that during her marriage state, before and after her sojourn in Bowling Green, she wrote this Ed. Ward unchaste and lascivious letters. The appellees did introduce proof to the effect that, in April and May, Solomon Froman was seen going about his business, and that no swelling was observed, and from the way that he handled himself, no unusual swelling existed. These witnesses might be mistaken as to the time; their recollections may be explained upon the ground of mistake as to time; but these doctors and nurses had reason to fix and recollect the time; there is scarcely any room for an honest mistake; their story is either true, at least as to the swollen condition of the man, or it is a fabrication. From the high character of the physicians, and the apparent honesty of the nurses, the latter fact is wholly improbable.

But it is contended that the proof of the conduct of Mr. and Mrs. Froman toward each other; their expressions of hatred and fear of each other; their statements during the time that they lived together;

apparently as husband and wife, as to non-access, are incompetent as evidence tending to show non-access. It is also contended that where the parties have opportunities of access—sexual intercourse—the child begotten in wedlock is conclusively presumed to be legitimate. We do not so understand the law as to either proposition. We understand the law to be that where the husband and wife have opportunities of access, there arises a very strong presumption that they did have it; but this presumption may be overcome by clear proof to the contrary, which may consist of proof that the husband was incompetent to have sexual intercourse, or from some cause he had declined to have sexual intercourse with his wife, or she with him. If such proof of conduct, declarations, &c., were not admitted as proof, it would be almost impossible to prove that the husband and wife had declined to have sexual intercourse with each other. It is a fact that husbands and wives, though living in the same house, or on the same farm, have often so lived, not as husband and wife, but, in fact, in a state of separation; so, in the absence of proof of a constant watch over them, night and day, it would be impossible to prove non-access, unless the proof of conduct, declarations, &c., were admitted as evidence. It is also contended that the proof of adultery, on the part of the wife, was incompetent.

Where access is either expressly or impliedly admitted, such proof is ordinarily inadmissible, unless it is such proof as unquestionably establishes the fact of illegitimacy, as that of the adulterous intercourse by a white woman, having a white husband, with a negro,

and the child born in the usual course of time there-
after was a negro; but where the proof shows that
the husband is not capable of performing the sexual
act, or that the parties have abstained from performing
the sexual act, then it is competent to prove adultery on
the part of the wife as corroborating the main fact. If
Mrs. Froman was shown to be, in fact, a virtuous wo-
man, such fact would create the belief that there was
some mistake or false swearing in reference to the in-
competency or non-access of her husband, or else incline
the chancellor to adopt the theory of the expert physi-
cians to the effect that, though from the swollen con-
dition of Froman, he could not enter Mrs. Froman's
person, yet in his effort to make the entry his semen
found its way into the vagina, and the appellee, Sol-
omon White Froman, was the fruit. But the proof
of her adultery drives away these conjectures and
strained theories made in behalf of chastity, and cor-
roborates the proof of non-access.

We do not understand that the fact that the hus-
band's access is either expressly or impliedly admitted
or proven about the time the child was begotten, is, in
all cases, conclusive of the child's legitimacy. The
presumption in such cases is only conclusive where
proof may be introduced *pro* and *con* as to the ques-
tion of legitimacy. No probabilities can be weighed
and considered. The fact of illegitimacy in such
cases can not be established by the weight of evi-
dence. Nothing short of some fact thoroughly es-
tablished, and when established can not be explained
away, as the case just mentioned of a white woman
having a negro child, will be allowed to prevail against
the presumption.

The proof of the illegitimacy of a child begotten in wedlock is a direct attack upon the mother's virtue and an accusation of a wanton violation of her marriage vows, and is a stigma upon the child, and taints its blood if the charge be true. Therefore, to hold that the mother thus assailed could not support her own innocence and honor, and the purity of the blood of her child by her oath that she was true to herself and offspring by keeping sacred what is enjoined by both Divine and human law, and upon the keeping of which the refinement and elevation of the race depend, would be a harsh rule indeed; but while she is allowed to do this, and in dubious cases she should do this, she should not, upon cross-examination, be allowed to withhold any part of the truth. The whole truth should come, although she would have to disclose acts of adultery.

The General Statutes provide, in substance, that if the wife voluntarily leaves her husband and lives in adultery, she shall forfeit her right of dower and distributable share in the husband's real and personal estate. This statute does not mean that she shall constantly live with one man in adultery during her abandonment of the husband in order to forfeit her right of dower or distributable share; but if she admits any man or men to her periodically, or whenever it is convenient or opportunity is afforded, during said abandonment, such conduct constitutes a living in adultery within the meaning of the statute. It is clear from the proof in the cause that Mrs. Froman's conduct was as above described, in consequence of which she forfeited her right to dower and distributable share in Solomon Froman's estate.

The judgment is reversed, with directions to deny Solomon White Froman any interest whatever in Solomon Froman's estate, and to deny Mrs. Froman any dower or distributable share in said estate, and for further proceedings consistent with this opinion.