## McMillan v. Massie's Executor et al.

(Decided June 11, 1929.)

A. M. HALL for appellant.

DENNIS DUNDON, HUNT & NORTHCUTT & BUSH, SAM COLE, JOHN J. WILLIAMS, TALBOTT & WHITLEY, FRANK McCARTHY, JOHNSON, AUXIER & HINTON, W. E. DARRAGH, O. T. HINTON and SMITH & REYNOLDS for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY— Reversing.

In a suit to settle the estate of W. C. Massie, deceased, reference was made to the master commissioner for the reception of claims and other purposes. The appellant, Sarah McMillan, who has since married and is now Sarah Paul, filed three properly verified claims, namely, No. 1 for $3,600 for nursing and keeping house for the decedent in Bourbon county for two years prior to January 1, 1917; No. 2 for $4,500 as the reasonable value for the use and occupancy by Massie of her residence on Wilgus avenue, in Lexington, for a period of five years, from January 1, 1927, until Massie's death in January, 1922; and No. 3 for $13,000 for nursing and care, day and night, in her home for the same period, at the rate of $50 a week. This last claim was amended to include services in taking Mr. Massie on three occasions and staying with him in sanatoriums in distant cities and to include housekeeping and cooking for him. Before the amended or corrected claim was filed the commissioner had allowed the claims and reported them to the court, to which exceptions were filed. No further order of reference was made, but the parties proceeded to take proof on the exceptions, and same was considered by the commissioner and the case treated as if there had been such order of re-reference.

After submission on the exceptions and depositions the commissioner filed another report disallowing claim No. 1 on the ground that it was barred by limitation, and

the other claims because they were founded upon illicit relations, and an illegal consideration, namely, that the claimant occupied the relation of a wife to the deceased and, consequently, could not recover for her services, under the authority of McDonald v. Fleming, 12 B. Mon. 285. Upon a hearing on exceptions filed to that report, the chancellor overruled them and sustained the finding of the commissioner dismissing the claims, with a judgment for cost against the claimant.

For various reasons this judgment was not rendered until January 8, 1928, although the decedent had died six years before. There was filed a motion to set aside the judgment and grant the claimant a new trial upon formal grounds, and because of newly discovered evidence, which was disclosed by numerous affidavits greatly strengthening the appellant's claims for compensation. These motions being overruled, this appeal is prosecuted.

It is now conceded by the appellant that her claim No. 1 for nursing, etc., during the period preceding January 1, 1917, is barred by limitation. It therefore need not be further noticed.

The decedent, W. C. Massie, was the only son of W. W. Massie, a wealthy citizen of Bourbon county, who died in 1906. Under the will of his father W. C. Massie had an income of about $10,000 a year. When about 18 years old W. C. Massie acquired the habit of using narcotics, whisky, and other stimulants and continued those habits for 35 years, until his death. During the life and after the death of his father he lived most of the time in Bourbon county on a farm, and while there would get on sprees and be ill, and Miss McMillan, who it was shown is a practical nurse, was often called to care for him, the calls being made by his father, his physicians, and others.

Jackson Collins, a half-brother of appellant, testified that Massie, while staying in Paris, called him and had him persuade his sister to go to the farm and care for him there. During 1915 and 1916 she and her brother lived at Massie's home in Bourbon county, this being the period covered by claim No. 1, now barred. After her brother married she returned to her own home on Wilgus avenue, in Lexington. This was early in January, 1917. Massie went to stay at the Phoenix Hotel. After being there a brief time (the evidence is not clear whether two or three days or two or three weeks) he sent for Harmon Collins, appellant's half-brother, who was staying

with her, and had Collins take him out there. When he arrived he said to Miss McMillan, according to her brother: ''I want to stay with you and I want you to wait on me here; if I stay at the hotel it will cost $100 a week and I have to have a nurse besides down there, and at night I can't keep warm, and I will have to have heat and I had rather be with you than anybody else, and he said, 'I want you to wait on me if I pay you $75 a week and have a cook and I will pay the bills if you will wait on me' and I stood there and heard it. He said he would pay the insurance and the cook and the bills and give her $75 a week, and I heard him make the agreement for his keep.'' The witness testified that Massie did not pay the taxes or insurance or furnish a cook or other servant; that once in a while he bought some groceries and provisions, but that his sister bought as many as he. He stated that he had known her to give him money with which to buy whisky and morphine. Jackson Collins stated that Massie told him before removing from the farm that he would rather be in Lexington with him and his sister, and that he would rather have his sister with him than to be in a hospital or a hotel; ''that she is the only one that will take care of me;'' and that ''he could get better treatment from her than any one;'' and, further, ''I will see that she gets paid some of these days for taking care of me.''

Other evidence to be referred to later in the opinion showed Massie's recognition of his financial obligation to the appellant.

In presenting her claims, however, the appellant did not rest them upon an express contract, but upon an implied contract. There was no kinship or other similar relationship which would deprive her of the right to recover under an implied contract.

In addition to denying the right to recover compensation for the use and occupancy of the house during the five years because of the alleged illicit relation, it is asserted that decedent had bought and paid for the property and furnished it. One witness testified appellant had told him this. The record of the title contradicts this admission. The property was deeded to Sarah McMillan by Maggie Foster and others in 1912 for the recited consideration of $1 cash and her note payable to one Kirtley, her brother-in-law, which note the record shows was paid in April, 1913. A list of checks drawn by Massie on his bank account filed in the record does not

disclose any check payable to the grantor at any time, nor any large check to any one which it could be assumed was for this purpose. Neither is there any check likely to have been used to pay the note.

The evidence of a verbal declaration by a party is generally regarded as of a weak character and entitled to but slight weight as against documentary evidence. 22 C. J. 237. Particularly is it to be so regarded when the lips of the one said to have made it are closed. But whether Massie gave her the property or not, it was hers absolutely and she had owned it for five years before he came to live there in 1917. The evidence that $75 a month is a reasonable charge for the use and occupancy of the property by Massie is undenied. This claim being disputed on the same ground as that for nursing and keeping house for the decedent, it must be sustained or must fail according to the determination of that claim.

By 1917 Massie's physical condition had become very bad. During the last five years of his life he was a physical wreck, a chronic invalid, having a cancerous condition of the stomach and ulcerated eye, which resulted in near blindness for awhile. He was, as stated, an habitual and excessive user of narcotics and whisky. It is indicated that he committed suicide. He was exacting in his demands, irritable, impatient, and peremptory, requiring immediate response to his every whim and call and demanding constant nursing and care both day and night. He was a very fleshy man and could not or did not even get himself a drink of water but always called upon appellant for everything, including assistance in dressing and in attending to the calls of nature. These exacting and menial services were rendered by Miss McMillan with kindness and a remarkable degree of patience. In addition to this nursing and care, appellant prepared his meals, looked after his clothing, and in every way tenderly cared for this unfortunate man. One of his physicians, Dr. Stucky, stated: "It was the kind of nursing and attention and the same care one would give a hopelessly, dangerously ill child." He stated "that $75 to $100 a week would be a fair and reasonable price" for the services rendered by her. The late Judge J. M. O'Brien, of Paris, and other intimate friends of Massie, as well as his two physicians—men of high standing—used similar or more descriptive expressions in bearing testimony to the loyalty and faithful services of the claimant. Others

place the value of these services at not less than $50 a week. A next-door neighbor also detailed the attention given by the claimant, and stated among other things that before Massie's condition became so bad she had seen him fall in the gutter and the mud in getting out of taxicabs. Upon calling for the appellant she would go and help him up, put him to bed, clean his clothes, and tenderly and patiently care for him.

There is little or no attempt to disprove or minimize the services rendered by the appellant nor the value thereof. It is conceded that he occupied the property. Payment is pleaded as will be hereinafter noted; but the defense is principally rested upon the ground that the services were rendered for an illegal consideration, to-wit, as an incident to immoral relations, as it is alleged the parties were living in concubinage or as husband and wife. There is much evidence in the record of the early history and relations of the parties, part of which is hearsay in its nature, and other portions introduced as the basis for an inference of illicit cohabitation. This evidence need not be reviewed. If it be conceded to support the purpose of its introduction, we may suffer the frailties of human nature to veil the past, for the best of men have erred and the wisest of the race have gone astray. It would be pharisaical and cruel for the courts to say that because persons may have sinned in the past they are deprived of contractual rights and cannot enter into a binding contract, recognizable in law, or that they may not have the benefits arising from a contract implied by and in law. That is not the law.

Of course, if the consideration for the contract was a continuation, renewal, or commencement of illicit relations an entirely different condition would arise and the contract would not be recognized, as will be presently noted. The presumption of a continuation of claimed illegal cohabitation is brought to bear by appellees in order to overcome the positive and affirmative proof of a specific arrangement, to wit, that Massie was to live in claimant's house and be nursed and cared for by her. It appears one of appellant's brothers or nephews stayed in the house most of the time. Suggestive conclusions are made because the parties were not only occupying the same house, but the adjoining or the same room. It is shown that instead of sleeping upstairs or in another part of the house Miss McMillan at first slept on a cot in the

dining room next to the room occupied by Massie, and as his condition grew worse she moved her cot into his room and placed it at the foot of his bed. From the evidence of his condition and of his constant calls and demands upon the appellant as his nurse, the presumption of immoral relations ought not to be and will not be raised by reason of the situation. The nurse who soothes the fevered brow and administers to the needs of her patient ought not to be and will not be stigmatized by insinuations, based upon assumptions. There is not a line of evidence of improper conduct during the period, and the only basis for inferable improprieties is their situation, and their former lives, more or less of the same character. No matter what the relations between these parties may have been in the years past, the conditions existing during the last five years of Massie's life repel any presumption of the existence of an illegal relation. Cf. Goss v. Froman, 89 Ky. 318, 12 S. W. 387, 11 Ky. Law Rep. 631, 8 L. R. A. 102. It would not be fair to appellant to omit saying that while she could not herself testify, there was substantial evidence supporting her denials of the charges brought against her. It is in evidence that as opportunity was afforded, when she would be relieved for a brief time by some friend on Sundays, she attended religious services at a nearby church, and during the latter years at her instance the pastor and others visited and talked with Massie concerning his spiritual welfare.

There is no evidence of any discussion or admission that Massie entered the home of appellant, or that these services were rendered in consideration of her sustaining an immoral relation to him. The direct evidence and the inferences reasonably and naturally deducible from the condition of the parties and the facts of the case are to the contrary. Who can with reason say that this trying, exacting menial service was but incidental to a state of concubinage? The principle of McDonald v. Fleming, supra, is that the law will not countenance an action for compensation for services which are incidental to an illegal cohabitation. That principle is sound and secure. There can be no justifiable departure from it. But each case presents a different state of facts to which that principle must be applied.

In Lytle v. Newell, 68 S. W. 118, 24 Ky. Law Rep. 188, the facts disclosed a rather flagrant violation of the

proprieties. It was admitted that the claimant, a young woman, had lived for a time with the decedent as his paramour. She claimed that that relation had ceased; yet the circumstances surrounding the parties were such as to render her story highly improbable. But because it was uncontradicted the court considered that the jury might have deemed part of the testimony plausible, and therefore held that the case should have been submitted to it to determine whether under the facts she could recover on her claim. The substance of the instructions and result may be found in Lytle v. Newell, 74 S. W. 693, 25 Ky. Law Rep. 120. The opinion first referred to is well reasoned, and the law of such cases is aptly stated.

It is only where the illicit relations between a man and woman form all or part of the consideration for a contract that it will not be enforced as a matter of public policy. Yowell v. Bottom, 175 Ky. 635, 194 S. W. 768. That case is quite like this one. The same ground asserted here was relied on to defeat recovery of a similar claim, but its application to the facts was denied, the opinion reciting:

> "With the exception of the fact that they were both single and lived in the same house, no witness testifies to any act of impropriety on the part of decedent and appellant. Viewing the case in the light of the age of the parties and of the decedent's eccentricities, we do not feel justified in presuming that their relations were such as are ordinarily maintained by husband and wife. Furthermore, there is nothing in the record from which it can be assumed that if their relations were improper, they formed any part of the consideration for the agreement between them with reference to appellant's services. Under these circumstances we perceive no principle of public policy that forbids a recovery in this case."

Even though the parties may have afterward sustained an unlawful relation, if such had not entered into the consideration for the contract and was not in contemplation when made, it would not invalidate the contract. 13 C. J. 461. Ecton's Executors v. Vinegar, 225 Ky. 15, 7 S. W. (2d) 487. The facts in McDonald v. Fleming, supra, Sackstaeder v. Kast, 105 S. W. 435, 31 Ky. Law Rep. 1304, and Doty's Adm'rs v. Doty's Guardian, 118 Ky. 219, 80 S. W. 803, 26 Ky. Law Rep. 63, 2 L.

R. A. (N. S.) 713, 4 Ann. Cas. 1064, cited by appellees, are materially different from those presented in this record, and the cases are easily distinguished.

We are of the opinion, therefore, that appellant was entitled to recover on her claims for nursing and other services as well as for the reasonable value of the use and occupancy of her home by the decedent, unless there has been a satisfaction or payment—next to be considered.

It is the contention of appellees that Massie paid all the expenses of the household, including the maintenance of claimant, and that by a deed of trust executed about a month before his death Massie satisfied any claim which she may have had against him. There is no claim being asserted for board, and we are not concerned with the conflicting evidence as to who paid for the food and other household expenses.

Judge O'Brien, who was perhaps the decedent's most intimate friend, testified that a short time before Massie's death: "I asked him if he had made any provision for Sarah in the event he died, and he told me that he intended to do that, and a short time afterwards I asked him if he had done anything about it and he said, no, he had not, and I told him then he surely ought to do it, because I didn't care what she got, as I saw it, he could not repay her for what she had done for him." This conversation was had perhaps a couple of months before Massie's death. Judge O'Brien further stated, or elaborated his statement by saying, that he told Massie he ought to make provision for Miss McMillan on account of the services rendered by her, as he thought he (Massie) owed it to her, and Massie told him that he was going to do it.

On December 8, 1921, C. N. Manning, president of the Security Trust Company, which was trustee under the elder Massie's will, and is now executor of his estate, went to the Wilgus avenue house and prepared Massie's will. By this he bequeathed to a cousin all of his tangible personal property and authorized his named executor to sell and convey his property "for the purpose of paying my debts and funeral expenses and making final settlement and disposition of my estate." At the same time he executed a deed of trust by which he placed certain designated securities of the value of $10,300 with the trust company, as trustee, the net income from which was to be thus disposed of: First, paid to Massie during his

lifetime; second, upon his death to whomsoever he (Massie) might direct by will or other testamentary paper; third, in default of such directions to pay the net income to Sarah McMillan for and during her life and upon her death dispose of the property as she might direct by her will or other writing of a testamentary nature; fourth, should Sarah McMillan fail to make such disposition, then to Massie's heirs at law.

This deed of trust was never recorded, and it is not shown that Miss McMillan ever had any knowledge of its execution prior to his death. Massie did not exercise the right retained to make testamentary disposition of the trust estate.

Massie did not know that he had the right to dispose of the corpus of the large estate left by his father, the income from which he had enjoyed. That question was not determined until nearly three years after his death, when it was decided by this court in the case of Bourbon Agricultural Bank & Trust Co., Guardian, etc. v. Miller, 205 Ky. 297, 265 S. W. 790.

It is shown by Mr. Manning that out of Massie's income the trust company had purchased in 1917 for his accounts bonds at the approximate cost of $10,000. The balance of the net income accruing in the five years was expended by and for Massie. Witnesses for appellees testified he was a free spender, and "always full of dope or whisky." The narcotics and whisky (some at $25 a quart) were costly. He was for some time able to go about in his automobiles with an employed chauffeur. He purchased and owned several automobiles. He went to institutions, accompanied by Miss McMillan, at considerable expense. It is shown that the aggregate amount of checks payable to Sarah McMillan during the five years was $2,780. This no doubt accounted for some of the household expenses and the money which some of the witnesses testified they had seen her give to Massie.

By his will and the trust deed Massie disposed of all the property which he individually owned, and it must be assumed he did not consider he had the right to direct disposition of the large trust estate. The appraised value of his personal estate was only $2,216. The trust estate of his father, which the court subsequently held to be his undevised estate, was about $330,000.

In Buckner's Adm'r v. Martin, 158 Ky. 522, 165 S. W. 665, L. R. A. 1915B, 1156, the testator, as guardian of the estate of her children, had in her possession an estate

belonging to them which it appears she had used as her own. She devised to these two children property largely in excess of that devised to her other children and exceeding what they would have received had she provided for payment of what she owed them and then made them equal with her other children. She did not specify in her will that her debts should be paid. It was contended that the extra bequests to the two children were intended to and did satisfy her indebtedness. The contention was not sustained, and it was held that the two children were entitled to be paid in addition to receiving the testamentary bounty. Judge Carroll, in the opinion for the court, fully considered the principles and questions involved. That case is also annotated in L. R. A. 1915B, commencing at page 1156, and the exhaustive notes treat the principle in its application to varying conditions.

We have here a much stronger case on the facts than the Buckner case, for Massie in his will specifically provided for the payment of his debts, and his obligation to appellant was greater than the contingent trust established for her benefit. Respecting the presumption often indulged as to a legacy to a creditor equal to or greater in amount than the debt, it is said in 28 R. C. L. 299:

"The presumption does not obtain where there is a direction in the will for the payment of debts, where the purpose of the legacy is expressly stated in the will, or where the testator merely bequeaths specific chattels to the creditor instead of giving him a money legacy. So where the legacy is smaller in amount than the debt, it will not be construed as a satisfaction of the debt. It is also well established that where the debt is unliquidated, or is owing on an open or running account between the parties, a legacy by the debtor to the creditor will not be deemed a satisfaction of the debt. Accordingly it has been held that a legacy by a debtor to his creditor did not constitute a satisfaction of the debt, when the same consisted of an unliquidated money demand due at the time of the testator's death, and the legacy was of specific chattels and money payable twelve months after the will was recorded."

The language used by this court in Lisle v. Trimble, 92 Ky. 304, 17 S. W. 742, 13 Ky. Law Rep. 595, is essentially the same, and the several exceptions stated were

applied to the state of facts there appearing as they should and must be applied to those now before us. See, also, Martin v. Daugherty's Executor, 4 Ky. Law Rep. 983, and Wade v. Dean, 43 S. W. 441, 19 Ky. Law Rep. 1326.

We have so far treated the trust established by Massie as if it were an absolute bequest. Although testamentary in character, the instrument as stated reserved the income to Massie during his life, with the further right to destroy the trust entirely by a will, and gave appellant only the income. If her testamentary disposition should fail the property reverts to Massie's heirs. As is disclosed in the L. R. A. annotations to the Buckner case, supra, a contingent legacy to a creditor will not be presumed as an intention to satisfy the debt, and where there is a difference in time of payment of the debt and legacy such is held to be evidence that the testator did not intend satisfaction. This rule was applied in Smith v. Park's Adm'r, 84 S. W. 304, 27 Ky. Law Rep. 12, where a claim for services as overseer was in litigation and the decedent had devised the claimant $500 in trust. Said the court:

"Moreover, the fact that the decedent devised the sum of $500, in trust to be paid appellant as he needed it, refutes the claim that she intended it as a payment of a debt. If it was money due by contract, she had no right to attach conditions to its use, and would not have done so. The will, in addition, contains an express devise for the payment of her debts, and this fact negatives the idea that the specific devise of $500 was intended as a payment, the rule being that, where a testator in his will directs all his just debts to be paid, if then he owed to his devisee a just debt, he virtually directs its payment as well as the payment of the legacy."

The foregoing cases are all rested on the leading case of Cloud v. Clinkinbeard's Ex'rs, 8 B. Mon. 397, 48 Am. Dec. 397, in which was involved a claim for services rendered a deceased person, and the principles above outlined were laid down, based upon ancient authorities. In that opinion it is held that a man ought to be just as well as generous.

The court is of the opinion, therefore, that the trust established for appellant did not constitute satisfaction of her claims against the estate.

Cases of this character should be scrutinized with care because of the ease for the spoliation of dead men's estates. As in most like cases, several pertinent questions suggest themselves to one's mind which the record does not answer: e. g., why should a man with ample estate postpone the payment of obligations until it is too late to pay them in his lifetime? Nevertheless, that is sometimes done. This case impresses us as being one having much merit, and to believe that Massie did not appreciate the devoted care and attention of this woman, and intended her to go unpaid, would be to reject not only the direct evidence of his intimate friends, but to do violence to the reasonable presumption arising from the provision of his will directing the payment of his debts. Had he known that he might have by will disposed of the large estate of his father we have no doubt that he would have made specific provision for the payment of these services.

As expressed in a recent case: "Although we repose confidence in a chancellor's finding of fact, yet when the finding does not accord with our conclusions from the evidence, or the requirements of the law, we must render judgment for the party entitled thereto on the facts proven." Turner v. Hammack, etc., 229 Ky. 836, 18 S. W. (2d) 285.

It is the opinion of the court that the judgment should be and is reversed, with directions to enter judgment in favor of the appellant on her claims for the value of the use and occupancy of her property and for her services in nursing and caring for the decedent.

Whole Court sitting.

Judges Clay, Logan and Grigsby dissenting.