## Louis P. Bottom, v. Fern K. Bottom,

(Decided May 16, 1911)

Appeal from Fayette Circuit Court.

1. Marriage and Divorce—Action for Divorce—Association With Persons of Lewd Character—Evidence Sufficient to Show Adulterous Relations—But Not Living in Adultery—While the testimony shows improper conduct on the part of the husband, and that he has likely committed acts of adultery, still it falls short of showing that he was living in adultery with another woman, as is required to be shown by the statutes to authorize a divorce on the ground of adultery.

2. Same—Cruel and Inhuman Conduct—The conduct of the husband described in the record was bad and improper, but was not the character of cruel and inhuman treatment contemplated by the statute, nor did it extend back six months preceding the beginning of the action.

3. Same—While the facts and circumstances show the wife to be unchaste, appellee is not entitled to the relief he seeks as he did not appeal, or ask a cross appeal from the judgment of divorce from bed and board.

ALLEN & DUNCAN for appellant.

WALLACE MUIR for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

This suit was instituted in the Fayette circuit court by appellant against her husband, Fern K. Bottom. She prayed in her petition for an absolute divorce, for the custody of their one child, a girl seven years of age, and for temporary and permanent alimony. The causes of action alleged in the petition were, first, living in adultery; second, habitually behaving toward her for not less than six months in such cruel and inhuman manner as to indicate a settled aversion to her and to destroy permanently her peace and happiness. Appellee answered denying the grounds of divorce, and made his answer a cross-petition against appellant alleging, first, that appellant had abandoned him; second, that she had been guilty and such lewd and lascivious behavior as proved her to be unchaste.

A great deal of proof was taken by both parties, much of which was directed to the question of property owned by the parties and the business of appellee as bearing

upon his ability to provide for his wife and child. The case was submitted and the court rendered a judgment dismissing both parties' actions for a divorce from the bonds of matrimony, but granted them one from bed and board, refused appellant alimony and placed the child in the custody of Mrs. Lillian DeBaum, appellee's sister residing in Mercer county. The court reserved the question as to allowing appellant her costs and counsel fees, for further consideration. It appears that a few days before the judgment was rendered, the court made an order to the effect that in the event a decree divorcing the parties should be rendered, they would not be barred from seeking by petition, one from the other, any property which either might have received from the other by reason of the marriage. This order seems to have been made because the parties had not completed their proof with reference to their property rights. This order having been made, we will make no further reference to the property of either, except to say that they were in reasonably fair circumstances.

Each party claims that the court erred in not granting them a divorce from the bonds of matrimony, and complain of the divorce granted. Appellant further complains that the court erred in not awarding her the custody of the child, but appellee is satisfied with the disposition of it. We will first consider the charge by appellant to the effect that appellee "lived in adultery with another woman," and the substance of the proof introduced to support it. Appellant introduced first as a witness Alice Von Phuel, a woman of bad repute, who lived in Louisville, Ky. She stated that she had met appellee upon one or two occasions in the city of Lexington while she was in that city for two or three weeks with Myrtle Hartman, a woman of like character; that she with another woman first met him upon the street and then for a few moments at his saloon, from which they went to another saloon and then to the house of Hartman in company with her and a colored woman who worked at the same place. She made it known that appellee did not have improper relations with her and that she saw none with the Hartman woman (they were the only women residing in the house), but she left the impression that appellee remained in the room with the Hartman woman. Appellant then took the deposition of Myrtle Hartman and this negro woman who worked

at the house. They testified that they went home with appellee and Lillian Von Phuel in a hack; that appellee and Von Phuel got out of the hack and they went on to another house where they remained for about three-quarters of an hour; that when they drove on they left appellee and Von Phuel standing on the porch and that they saw them no more that night. The Hartman woman made it appear that appellee had no improper relation with her, but left the impression that he did have with Von Phuel. The Hartman woman testified that on one other occasion appellee was at her house something near the middle of the night, but came in response to a telephone massage to bring her some whiskey. The time referred to by these witnesses was January, 1910. six or eight months after the separation of the parties. Appellant also introduced one Inez Butler, a negro woman, who testified that she worked at the home of the parties to this suit while they lived together; that appellee one afternoon, while she was ironing in the kitchen, asked her if she did not want $3 and caught her by the hand and attempted to pull her into another room, but she pulled away from him and commenced to cry because of the insult. She stated that a door which entered the kitchen from the porch was open and that a man was at work screening the porch at the time appellee came into the kitchen. Appellee introduced this man and he stated that he was at work on the porch and that if such a thing as described by the negro woman had happened in the kitchen he would have noticed it. He fixes the time of this alleged occurrence at a period of about one year before the separation. Inez Butler was asked while she was in the witness stand if she was married and if she had any child. She answered that she had not been married and had no child. She was then asked if she did not have a child about three weeks of age in the room where she was testifying, and she answered "yes." All this testimony, if true, shows very improper conduct on the part of appellee, and that he has likely committed acts of adultery, but it falls short of showing that he was guilty of living in adultery with another woman, as is required to be shown by the statutes. Counsel for appellant concede this, but contend strenuously that the testimony shows that appellee habitually behaved towards appellant, for not less than six months before the action was brought, in such a

cruel and inhuman manner as to indicate a settled aversion to her and as to destroy permanently her peace and happiness. We will refer to the substance of the testimony introduced upon this point, but will preface it by giving a short history of the married life of the parties as shown by the record. They married when young; were both healthy, vigorous and good looking, and appeared to live peaceably and happy. One child, a girl, was born to the union. Sometime after they married they moved to a house about one-half mile from the city limits of Lexington. It is stated that they had some little trouble at one time prior to the final separation, but there is no intimation as to the cause or character of the trouble. Thus they lived, with the exception stated, apparently happy enjoying all the necessaries and luxuries common to persons of their standing. On Sunday morning, May 3, 1909, appellee went on an excursion to some pleasure resort with a secret order known as the "Eagles," of which he was a member. He left his wife and child at home with her father. On this same day, and without the knowledge of appellee, appellant left home and went to Cincinnati, Ohio, leaving the child with a neighbor, Mrs. Forsythe. When appellee returned home he seemed to be in a bad humor; he took the child, carried her to Mercer county and left her with his sister, Mrs. DeBaun. Appellant returned home on the following Sunday, remainder a day or two, it seems, without seeing appellee or her child, and went back to Cincinnati and from there to New York City where she remained for nearly three months. She did not communicate with her husband nor any of his family while she was in New York, but did send the child a few picture postal cards. It seems that no one knew her address while she was in New York, except Mrs. Forsythe and she was directed not to communicate it to any one. She returned in the fall, brought her trunk and went to housekeeping again at her home, and went to Mrs. DeBaun's and brought the child back; and she, the child and Mrs. Bottom's father occupied the house alone. Soon after her return, appellee found two letters in her trunk which were written and signed by a man he knew and in very endearing terms. They were directed to her in her maiden name, "Louise P. Perrin," and were sent to New York. A short time after he found the letters, he went to the house one night when his

wife and child were in bed or preparing to go to bed. The child was introduced as a witness, but it was shown that she was only seven years of age and could not comprehend the nature of an oath. She stated that her mother let her father into the house; that she then secured a rifle which her father jerked away from her and threw into the yard; that her father was standing near her mother when a pistol he had in his hand went off and shot into the floor; that her father called her mother some bad names, a bitch or something of the kind; that he drank a bottle of whiskey; that he went to bed with her and remained all night; that her mother went to a neighbor's to telephone for a policeman, but was informed that they would not come outside of the city limits; that her mother, after she returned from the neighbor's, went up stairs and slept, and that when they awoke the next morning her father was gone. This is the substance of the alleged cruel conduct on appellee's part, and it occurred after the separation and after appellant's return from New York. This was bad and improper conduct, but not, in our opinion, the character of cruel and inhuman conduct contemplated by section 2117, Kentucky Statutes, nor did it extend back six months next preceding the bringing of this action. The inference is, that appellee was caused to act as he did by reason of the acts of appellant from the time she left him the Sunday referred to. What he said and did was, in a measure, caused by appellant. We infer that the child was mistaken in regard to him drinking a bottle of whiskey, as all the proof shows that he never drank whiskey, and that he, his wife and child drank beer regularly at their meals and at other times. We are of the opinion that it was beer he drank and not whiskey as the child thought. We are further of the opinion that the court did not err in dismissing appellant's petition for a divorce.

Appellee's counsel complains that the court erred in failing to grant him a divorce. In addition to what we have stated with reference to appellant's conduct, the testimony shows that she remained in Cincinnati for a week at the Hotel Princeton; that she, with another woman by the name of Mrs. Laura Wedge, attended the races at Latonia daily and made bets. This Mrs. Wedge left Lexington a few days before appellant did, but while there she lived with a man she claimed was her

husband. She was a milliner and was with appellant a great deal until after she left Cincinnati. While in that city appellant was escorted by Lon C. Elliott, who previously resided in Lexington, and Mrs. Wedge by a man they called "Martie." Both of these men were recognized gamblers. Appellant told Elliott that Mrs. Wedge claimed that she had married Martie while in Cincinnati Elliott testified that he was with appellant every day but one which we will refer to later, during that week; that he was with her at the race track a great deal; that he left there with her and took her to a hotel in Cincinnati, and to the Emory restaurant for several meals; that he went with her to picture shows repeatedly and to the theater and to the Stag Hotel for dinner at about eleven o'clock p. m.; that he was out with her every night, but one, until a late hour; that he was a single man and appellant knew it; that he met appellant when she returned to Cincinnati from her home on her way to New York and at that time got her New York address; that she left with the understanding that he was to get some money, go to New York, furnish some flats, take care of and live with her. Mrs. Wedge also went with appellant to New York, and Martie was to go, but it is not shown whether he went or not. He nor Mrs. Wedge testified in this case. Mrs. Forsythe, with whom appellant left her child, appears to have been her dearest friend in Lexington; she and her husband resided very close to appellant. Upon the day that Elliott was not with appellant, they were at the races in Latonia. Elliott went to the betting shed and on his return to the grandstand he found Mr. Forsythe talking to appellant. Elliott took a seat by Mrs. Wedge so as to place the two women between the two men, and in a few moments appellant and Forsythe started to leave the grandstand, she went by Elliott and told him that Mr. Forsythe had a great deal to tell her and she would for that reason, have to go. They left and Forsythe was not seen any more at all and appellant not until the next morning. Elliott asked her what Forsythe had to say to her and she told him that Forsythe wanted her to run off with him and get married, and that she told him he was a "fool" for wanting to leave his children and the good woman he had. Elliott agreed with her in these remarks and said that was proper. Appellant introduced a witness or two to show that Elliott's reputation for truth and ver-

acity was bad. It is strange, however, that Mrs. Wedge and Forsythe were not introduced to show the falsity, if any, of the statements he made while on the witness stand implicating them. It appears to us that Forsythe would have demanded a right to testify and relieve himself from the odium as well as place appellant right before the world. When a witness is impeached we are not compelled to disregard all his testimony; we may believe it if it is reasonable and supported by other testimony. The fact that Elliott is not contradicted by the two witnesses named, is a strong circumstance as to the truth of his testimony, especially when no excuse is given for not introducing them. Further, Lon C. Elliott's testimony is supported by two letters which were written to appellant by him while she was in New York and which were found in her trunk when she returned. The letters being of the same nature, we will copy but one of them, to-wit:

"June 21, '09.

"Dear Louise:—

"Received all your letters, and dear, was certainly delighted to hear from you, and very sorry you do not like N. Y.—but sweetheart, N. Y. is a large city, and I am not surprised at your not liking it. Say, sweetheart, do you want to come back to Cincinnati? You need not be worried, for everything is all O. K. There hasn't been any one looking for you and I am sure you could stay here all O. K. until things were so we could leave together. Now, listen Louise, if you can not come, why if I can I will send you a ticket this week so you can come back to Lonnie for I am just crazy to see you, so please answer this letter as soon as you receive it, for dear, I will get you a place to stay all O. K. and if you have to work, which I hope you will not, you will be with me, and we will work together. Now, listen, sweetheart, I mailed you a letter in care the Navarre. Did you get it? But it does not make any difference, sweetheart, just write me and tell me you want to come back to me, and I will sure and try to send you a railroad ticket from N. Y. to city, and some money with it, but sweetheart, if you want to come before that you can get the money by letting some one hold your jewelry, but do not do that, for dear, I will get the money some way and send it to you, so you can come, for dear, I do not think I will come, for sweetheart I am going to make

some money before the meeting closes, sure, and then you and I will go away and I will see you get all O. K. if you come and you can go over in Dayton, Ky., or Newport and board so they would not have any idea where you were, so dear, please answer as soon as you receive this. Tell Mrs. Wedge I haven't forgot her, and I sure will sent the ten to her. Martie left for Hamilton, Canada, tonight. Well, sweetheart, I will say good by, and I only wish I was with you from your

"Loving sweetheart,

"Lon C. Elliott.

"To Stag Hotel, Cin., O."

We have positive evidence that she received these letters from Elliott and that she wrote to him, as he acknowledges in his letter that he received all her letters and expressed himself as being "delighted" with getting them. So it appears that appellant made Mrs. Wedge her associate and friend; that she received the attention of Elliott, a single man; that she left her home without notice to any one except Mrs. Forsythe and remained away for three or four months under an assumed name, keeping her address from all except Mrs. Forsythe and Elliott. All this proves to our minds such lewd, lascivious behavior as proves her to be unchaste. There is no direct proof of adultery on her part; Elliott disclaimed that in his testimony, but all the facts and circumstances appearing in the testimony, show otherwise; at least, proves her to be unchaste. We are powerless, however, to give appellee any relief as he did not appeal or ask a cross-appeal.

Both parties complain of the divorce from bed and board. The pleadings authorized the court to render this judgment. Section 2121, Kentucky Statutes, provides in part, as follows:

"Judgment for separation or divorce from bed and board may also be rendered for any of the causes which allow divorce, or for such other cause as the court in its discretion may deem sufficient."

The court determined that the testimony was at least sufficient to authorize a separation from bed and board as there were no longer any prospects of their resuming marital relations after an exposition of their conduct as set out in this record.

The court further determined that it was to the child's interest that neither party have the care and raising of it; and, therefore, placed it in the custody of its aunt, Mrs. Lillian DeBaun, an excellent lady, according to the testimony, and one who is in all respects fully capable of performing her duty towards the child. The court left the order with reference to the child's welfare open and this was proper.

For these reasons, the judgment of the lower court is affirmed.