## Bond v. Bond's Admr., et al.

(Decided November 1, 1912.)

### Appeal from Anderson Circuit Court.

1. Adultery—What Constitutes—Meaning of Statute.—Section 2133 of the Kentucky Statutes, which provides that if a wife voluntarily leave her husband and live in adultery, she shall forfeit her dower right and distributable share in her husband's estate, does not mean that she must constantly live with one man in adultery during her abandonment of her husband, to forfeit her right of dower or distributable share; but, if she admits any man or men to her periodically, or whenever it is convenient, or opportunity is afforded, during said abandonment, such conduct constitutes a living in adultery within the meaning of the statute.

2. Adultery—Rule as to Evidence of Paramour.—The rule is, that while the testimony of the alleged paramour may be considered in determining the fact of adultery, it is liable to grave suspicion, and should be acted upon with extreme caution.

3. Finding of Chancellor.—Where the question at issue is one purely of fact, the decision of the chancellor, who knew the parties, the witnesses, and their standing in the community, will not be disturbed.

WILLIS, TODD & BOND and L. W. McKEE for appellant.

F. R. FELAND for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

Matt S. Bond and Blanche Nowlin were married October 16, 1909. He was then 19 years of age, and she was under 16. They lived together in Lawrenceburg for about five months; but, differences having arisen, she left her husband in March; remained away for a week, and then returned and lived with him from Monday until Thursday. On March 17, 1910, she again left him, and went to visit her aunt in Louisville, where she remained a week. Her husband accompanied her to the train, and paid for her ticket. They never lived together as husband and wife thereafter, although they saw each other repeatedly, and he was attempting to bring about a reconciliation. Upon Mrs. Bond's return from Louisville on March 23, she went to her father's home at Tyrone, being accompanied by her aunt. On March 27,

the two returned to Louisville, where Mrs. Bond remained until April 23, when she again returned to Tyrone. On May 4, she went to work, and had not lost any time from her work up to the time the evidence was taken in this case. On the afternoon of Monday, July 25, 1910, Matt S. Bond accompanied his wife to the residence of her aunt, Mrs. Gortney, in Lawrenceburg, and left her at the gate. On the next night, Tuesday, July 26, 1910, Bond called to see his wife at Mrs. Gortney's, and while there, in a fit of desperation, he committed suicide by shooting himself. He left some debts, and personal property which netted $269.19, which is in the hands of his administrator, and is the subject of this action. This sum is claimed by Mrs. Bond's guardian for her under subsection 5, of section 1403 of the Kentucky Statutes, which sets aside to the widow certain specific articles as exempt from distribution and sale, and if not on hand, then money in lieu thereof not to exceed $750.00, in cases where the husband dies intestate. The appellant also claims this money as the father and heir-at-law of his deceased son; and brought this action against the administrator, and the guardian of Mrs. Bond, to prevent its payment to any person other than himself. Matt S. Bond and his wife were never divorced, but appellant claims she forfeited her right of dower and distributable share in his personalty under section 2133 of the Kentucky Statutes, which reads as follows:

"If the wife voluntarily leave her husband and live in adultery, or if the husband voluntarily leave his wife and live in adultery, the party so offending shall forfeit all right and interest in and to the property and estate of the other, unless they afterward become reconciled and live together as husband and wife."

The circuit court dismissed the petition, and the plaintiff, James L. Bond, prosecutes this appeal.

The only proof tending, in any degree, to sustain the charge of adultery, is found in the testimony of William H. Turner, who testified that he had offended with Mrs. Bond on two separate occasions, once in Lexington in the summer of 1910, and again in Tyrone shortly thereafter; and in the evidence of Claude Shanklin, who says that he also had offended with Mrs. Bond in Lawrenceburg during the same summer. She admits that she left her husband, but she vigorously denies the charges of adultery and lewdness, *in toto.*

In determining what constituted living in adultery under section 2133 of the statutes *supra,* this court laid down the following rule in Goss v. Froman, 89 Ky., 329:

"The General Statutes provide, in substance, that if the wife voluntarily leaves her husband and lives in adultery, she shall forfeit her right of dower and distributable share in the husband's real and personal estate. This statute does not mean that she shall constantly live with one man in adultery during her abandonment of the husband in order to forfeit her right of dower or distributable share; but if she admits any man or men to her periodically, or whenever it is convenient or opportunity is afforded, during said abandonment, such conduct constitutes a living in adultery within the meaning of the statute."

Measuring the evidence by the foregoing rule, what is the result? At the time of his alleged misconduct, Turner was employed in a subordinate position at the Eastern Kentucky Lunatic Asylum in Lexington. He says he went with Mrs. Bond to a certain hotel in Lexington and registered as "W. F. Ward," taking a room, and remaining there with her for a part of the afternoon, or night. He does not give the month in which this occurred, but says it did occur while he was employed at the asylum; and, it appears from the testimony of the superintendent of the asylum that Turner was employed there from March 30 to July 31, 1910, when he was discharged for drunkenness. To meet this testimony, Mrs. Bond swears, and in this she is corroborated by her parents, that she never was in Lexington in her life except upon two occasions, when, as a child of 6 and 10 years respectively, she went through that city upon the cars with her parents.

Furthermore, it appears from the evidence of her mother, and those in charge of the place where she works, that she was constantly employed in Tyrone from May 4, 1910, until the testimony was taken, with one or two absences at night, which are fully explained, and shown to have been spent with her kin.

Furthermore, Turner's character for truth and sobriety has been thoroughly and completely discredited.

Turning to the evidence of Claude Shanklin, we find nothing of any more substantial merit. He kept a small pants pressing establishment in the rear of a barber

shop in Lawrenceburg. He admits that he repeatedly lied to his wife, and finally deserted her, going to St. Louis, where he resided at the time he gave his testimony. And, in explanation as to why he voluntarily came from St. Louis to Kentucky to give his evidence, he says the appellant sent him a railroad ticket, and did not know what his testimony would be until after he had returned to Kentucky; and that, to ease his mind, he concluded it was proper for him to testify for the appellant. Shanklin is also discredited by numerous substantial citizens of his home town.

The rule is, that while the testimony of the alleged paramour may be considered in determining the fact of adultery, it is liable to grave suspicion, and should be acted upon with extreme caution. 14 Cyc., 697.

In passing on a state of facts similar to the one before us, we used this language in Evans v. Evans, 93, Ky., 516:

"The only evidence in this respect which we regard as worthy of any consideration is that of one witness, who testifies, in substance, that the wife offended with him.

"So far as this record shows he was an entirely willing witness. He does not appear to have been attached and made to testify. It is not even shown that he was subpoenaed as a witness. He was entirely willing to not only destroy the wife, affix a stain to her children and family, but also to testify to conduct degrading to and highly blamable in himself. Such evidence is justly subject to suspicion. It comes in doubtful form. The lower court doubtless knew the parties, and he disregarded it. Under the circumstances, his conclusion upon this question of fact ought not to be disturbed."

So in the case at bar. The question at issue is one purely of fact. The chancellor knew the parties, the witnesses, and their standing in the community; and under the circumstances, we do not feel inclined to disturb his finding.

Judgment affirmed.