Jackie GRIFFIN, Individually and as Administratrix of the Estate of Curtis W. Rice, Appellant,

v.

Kathy RICE, Appellee.

No. 2011–SC–000250–DG.

Supreme Court of Kentucky.

Sept. 20, 2012.

Otis Doan, Jr., Otis Doan, Jr., P.S.C., Harlan, KY, for appellant.

Karen Sue Davenport, Harlan, KY, for appellee.

Opinion of the Court by Justice ABRAMSON.

Kathy and Curtis Rice were married approximately four months before separating and filing for divorce. While they were separated but still married, Curtis died in a work-related accident. Jackie Griffin, Curtis's mother and the administratrix of his estate, claims Kathy is barred by Kentucky Revised Statute (KRS) 392.090(2) from receiving an inter-est in Curtis's estate. This statute provides that a spouse who voluntarily leaves the other and "lives in adultery" forfeits his or her right to and interest in the other's estate and property. Based on Griffin's proof at trial that Kathy had sexual intercourse with another man the night prior to Curtis's death, the trial court held that Kathy forfeited her interest in Curtis's estate pursuant to KRS 392.090(2). The Court of Appeals reversed, holding the single act of adultery engaged in by Kathy prior to Curtis's death was insufficient to constitute "liv[ing] in adultery" under the statute. We agree that the statutory language "lives in adultery" requires more than a single instance of adultery. Accordingly, we affirm the Court of Appeals opinion, reverse the ruling of the Harlan Circuit Court and remand this matter for proceedings consistent with this Opinion.

### RELEVANT FACTS

Kathy and Curtis Rice married on February 20, 2004 and separated less than five months later in July, 2004. Curtis left the marital residence and moved in with his mother, Jackie Griffin. On August 20, 2004, Kathy obtained a domestic violence order against Curtis and five days later she filed a petition for dissolution of marriage in Harlan Circuit Court. Curtis contemporaneously filed an entry of appearance but no further action was taken in the case. On September 12, 2004, while Kathy and Curtis were separated but still married, Curtis died in a work-related accident.

The Probate Division of Harlan District Court appointed Griffin the administratrix of Curtis's estate and on January 19, 2005 Griffin filed a complaint in circuit court for a declaratory judgment. Griffin specifically requested the court declare Kathy had forfeited her right to and interest in Cur-

tis's estate under KRS 392.090(2), which provides that when a spouse voluntarily leaves the other and "lives in adultery," he or she forfeits their right to and interest in the other's property and estate. Kathy denied the statute barred her right to a share of Curtis's estate and moved for summary judgment on August 2, 2007. In a supplemental response to Kathy's motion for summary judgment, Griffin produced an affidavit from Billy Halcomb, a man Kathy had dated. Halcomb stated he and Kathy went out on September 10 and 11, the Friday and Saturday prior to Curtis's death on Sunday, September 12. Halcomb further testified in his affidavit that on Saturday, September 11, he and Kathy went to a bar, became intoxicated and had sexual intercourse. According to Halcomb, he and Kathy continued to see each other after Curtis's death and ultimately lived together for eight or nine months. The circuit court found Halcomb to be a credible witness and, based on his testimony, denied Kathy's motion for summary judgment on May 9, 2008. During the subsequent bench trial, Halcomb testified consistently with his affidavit while Kathy testified she did not meet and start dating Halcomb until October 2004, about a month after Curtis died. Kathy further maintained she did not engage in sexual

intercourse with any man other than her husband while they were separated.[1] The court again credited Halcomb's testimony and, considering all the evidence and applicable law, entered judgment against Kathy.

Kathy appealed both the trial court's denial of her motion for summary judgment and the court's ruling that KRS 392.090(2) barred her from receiving her share of Curtis's estate. The Court of Appeals reversed, holding the circuit court should have granted Kathy's motion for summary judgment. The Court of Appeals found the statutory language, "lives in adultery," requires proof of more than a single act of adultery and, according to Halcomb's testimony, he and Kathy only had sexual relations on one occasion prior to Curtis's death. As such, the Court of Appeals concluded the requirements of KRS 392.090(2) could not be met and the trial court should have granted Kathy summary judgment. This Court granted Griffin's ensuing motion for discretionary review to address an issue of first impression, that is, whether one act of adultery is sufficient to satisfy the statutory requirement of KRS 392.090(2) that the offending spouse "lives in adultery."[2]

---

1. Griffin also presented evidence that Halcomb was not the father of Kathy's son, who was born on June 3, 2005, and that two years after the child's birth and well into the course of this litigation, another man had also instituted a paternity action concerning the child. The result of the second paternity action was not available at the time of trial, though Kathy testified she knew that man was not the father of her child because they had never had sexual intercourse. Kathy further testified she and Curtis did have sexual intercourse after they separated and she knew the identity of her child's father, though the man's identity was never revealed at trial. While Griffin presented this evidence to bolster its claim that Kathy "live[d] in adultery," there is no evidentiary value to this line of inquiry be-

cause Griffin never established when the child was conceived or that Curtis was not the father.

2. Griffin raises two points of error before this Court. First, that the Court of Appeals should not have reviewed the circuit court's denial of Kathy's motion for summary judgment because it was not properly before the court and, second, that the Court of Appeals' interpretation of the phrase "lives in adultery" was wrong. We begin with Griffin's second claim and, as it is dispositive, need not address Griffin's claim regarding summary judgment. We note, however, that the resolution of the case would be the same under either claim.

## ANALYSIS

▋ Resolution of this case turns, on the proper construction of KRS 392.090(2). The construction and application of a statute is a matter of law and we therefore review the pertinent statute *de novo*, without deference to the interpretations adopted by lower courts. *Wheeler & Clevenger Oil Co., Inc. v. Washburn*, 127 S.W.3d 609, 612 (Ky.2004).

KRS 392.090(2) was modeled on the English statute of 13 Edward I, c. 34, enacted in 1285, and commonly known as the "Statute of Westminster Second."[3] *See Baldwin v. Cook*, 232 Ky. 365, 23 S.W.2d 601 (1930). Kentucky initially adopted the statute in 1796[4] and codified the current version as KRS 392.090(2) in 1942. The statute provides, "If either spouse voluntarily leaves the other and lives in adultery, the offending party forfeits all right and interest in and to the property and estate of the other, unless they afterward become reconciled and live together as husband and wife." The statute thus has two requirements that must be met before

a husband or wife forfeits his or her interest in the other spouse's property and estate: (1) the husband or wife must "voluntarily leave[ ]" the other spouse and (2) he or she must "live[ ] in adultery." The only issue with which we are concerned in this case is the import of the latter requirement, that the offending spouse "lives in adultery."[5]

▋ Very few cases in the Commonwealth have addressed what conduct on the part of the leaving spouse is necessary to satisfy the requirement that he or she "lives in adultery," and only one has spoken to the issue at any length. In *Goss v. Froman*, 89 Ky. 329, 12 S.W. 387 (1889), the wife left her sick husband in Louisville and went to Bowling Green, where she had sexual intercourse with at least two men, one of whom she had sexual intercourse with several times and wrote "unchaste and lascivious" letters to both before and after her trip to Bowling Green. *Id.* When she eventually returned to Louisville she stayed with a friend and never returned to her husband. 12 S.W. at 388. Based on

---

3. This statute provided, "And if a Wife willingly leave her husband, and go away, and continue with her advouterer [adulterer], she shall be barred forever of Action to demand her Dower, that she ought to have in her husband's lands, if she be convict thereupon, except that her husband willingly, and without coercion of the Church, reconcile her, and suffer her to dwell with him; in which case she shall be restored to her Action."

4. The provision was part of an "Act concerning the dower and jointure of widows," approved December 19, 1796, 1 Litt. 516. Kentucky's initial version of the statute was largely unchanged from the English version and provided, "But if a wife willingly leave her husband, and go away and continue with her adulterer, she shall be barred forever of her action to demand her dower that she ought to have of her husband's lands, if she be convict thereupon; except that her husband, willingly and without coercion, reconcile her and suffer her to dwell with him; in

which case she shall be restored to her action."

5. Indeed, the parties question only the meaning of the phrase "lives in adultery" and do not raise any issues concerning the interpretation or application of the other requirement, that the spouse "voluntarily leaves" the other. We note, however, there may be concerns about the voluntariness of Kathy's "leaving" in this case, given the fact that Curtis moved out of the marital residence; Griffin's testimony at trial that Curtis had a temper; Kathy's testimony that Curtis beat her, causing her to leave their home and stay with her parents for a period of time; and the domestic violence order Kathy secured against Curtis. We do not address the "voluntarily leaves" requirement in part because the parties did not raise the issue and in part because it is not necessary for the resolution of this case, as our finding regarding the meaning of "lives in adultery" is dispositive.

this conduct, the *Goss* Court found the wife had left her husband and "live[d] in adultery." The Court explained that "lives in adultery"

> does not mean that she shall constantly live with one man in adultery during her abandonment of the husband, in order to forfeit her right of dower or distributable share; but if she admits any man or men to her periodically, or whenever it is convenient or opportunity is afforded, during said abandonment, such conduct constitutes a living in adultery, within the meaning of the statute.

*Id.* at 390. *See also Bond v. Bond's Adm'r*, 150 Ky. 389, 150 S.W. 363 (1912). While this discussion makes clear that a woman need not live constantly with another man to be "liv[ing] in adultery" it also indicates that one instance of adultery is insufficient under the statute. Rather, the husband or wife's affairs must be periodic or recurring, a sustained or notorious activity. The adultery need not be with the same man or woman, but there must be more than one instance of adultery for a husband or wife to "live[ ] in adultery" under KRS 392.090(2).

The General Assembly's intention that more than one act of adultery be required is indicated by its intentional use of the word "lives" in the phrase "lives in adultery." Had the General Assembly considered one instance of adultery sufficient to bar a husband or wife from his or her interest in the other spouse's estate and property, it would have made this clear by employing different wording in the statute, such as "commits adultery" or "engages in adultery." Another statute, in effect at the same time as the statute at issue, indicates the General Assembly was aware of the import of its phrasing and knew exactly how to distinguish between one

adulterous act and multiple acts of adultery.

Kentucky's former fault-based divorce statute, Ky. Stat. § 2117,[6] listed different causes for which a court could grant a divorce to a husband or wife. According to the statute, a husband or a wife could obtain a divorce on the grounds that the other was "living in adultery with another man or woman" and a husband could obtain a divorce on the grounds of "adultery by the wife." *Id.* In creating the statute, the General Assembly employed different language in the same section for the adulterous conduct by a wife that justified a divorce and the adulterous conduct by a husband that justified a divorce. Interpreting this language, this Court's predecessor held that a husband only had to prove a single act of adultery by his wife to meet the statutory requirement of "adultery by the wife," whereas a wife had the higher burden of proving her husband had been "living in adultery" to secure a divorce. *Baker v. Baker*, 136 Ky. 617, 124 S.W. 866 (1910). The General Assembly's use in the same provision of different standards of proof for adultery indicates that "living in adultery" means something different than "adultery by the wife." *Id.* If "adultery by the wife" requires only a single act of adultery, then "living in adultery" requires more than a single act of adultery. *Id.* at 867. *See also Booth v. Booth*, 12 Ky. Law Rep. 988 (1891). In further explaining what behavior constitutes "living in adultery" under the divorce statute, the *Baker* Court employed language similar to that used by the *Goss* Court to describe what behavior constitutes "lives in adultery" under the statute at issue:

6. Ky. Stat. § 2117 was recodified as KRS 403.020 in 1942 pursuant to Ky. Acts ch. 208, sec. 1 and repealed altogether in 1972, pursuant to Ky. Acts ch. 182, sec. 29.

While to constitute a living together in adultery there must be more than a single act, there need not be a living together continuously, or for a given time, nor is it necessary for the man to abide in the same house with the woman; but if he at stated periods, or frequently, spend the day or night, or any considerable part of his time with a woman, not his wife, at such times having carnal knowledge of her at will, though at other times he be domiciled with his wife, it constitutes the offense against the wife's marital rights which the statute declares a ground for divorce.

*Baker,* 124 S.W. at 867.[7] Though addressing a different statute, the *Baker* Court's interpretation of a nearly identical phrase reinforces the conclusion that "lives in adultery" requires more than one instance of adultery. *See also Bottom v. Bottom,* 143 Ky. 666, 137 S.W. 198, 199 (1911) (finding testimony that husband may have had sexual relations with one or two other women showed "he has likely committed acts of adultery, but it falls short of showing that he was guilty of living in adultery with another woman, as is required to be shown by the statutes."). The language chosen by the General Assembly in the contemporaneous divorce statute makes clear the legislature was aware of the significance of its phrasing and was able, had it meant to do so, to employ language that indicated one act of adultery would be sufficient to bar a husband or wife from his or her interest in the other spouse's estate and property.

Courts interpreting similar statutes in sister jurisdictions have reached the same conclusion we do today. In *Stegall v. Stegall,* 22 F.Cas. 1226, 1227 (C.C.D.Va.1825), the court stated that under a Virginia statute providing, "if a wife willingly leave her husband, and go away and continue with her adulterer, she shall be barred forever of action to demand dower," the requirement that the wife "continue with her adulterer," is satisfied by an "open state of adultery." The wife in that case was held to have lived in an open state of adultery and thus had forfeited her dower where she voluntarily left her husband and lived with another man in a relationship approximating marriage. *Id.*

In *In re Estate of Montgomery,* 137 N.C.App. 564, 528 S.E.2d 618 (2000), the court had to determine whether a wife had "live[d] in adultery" and so lost her right to administer her deceased husband's estate pursuant to a statute that divests a spouse of this right when he or she "voluntarily separates from the other spouse and lives in adultery and such has not been condoned." (quoting N.C.G.S. § 31A–1(a)(2) (1999)). The *Montgomery* Court rejected the petitioner's argument that a single act of adultery was sufficient to satisfy "lives in adultery" and instead construed the phrase to mean a spouse engages in "repeated acts of adultery." *Id.* at 621. The court therein reached this conclusion by looking to the distinction between "committing adultery" and "living in adultery" made by the legislature in the

---

7. The husband in *Baker* was found to have been "living in adultery" where witnesses testified the husband had been frequently and publicly consorting "with a common prostitute and inmate of a Megowan street bawdy-house." 124 S.W. at 867. Though none of the witnesses saw the husband commit the act of adultery, "a man so lost to all sense of decency as to openly consort with harlots on the streets of a populous city and to be frequently seen with them in a house of ill fame, and there availing himself of the usual means and opportunities for sexual intercourse with them, will be presumed to have given free rein to his lustful propensities, and to have committed the act of adultery with each opportunity." *Id.*

state's divorce statute, which provided that the causes for divorce include "(1) If either party shall separate from the other and live in adultery" and "(2) If the wife shall commit adultery." *Id.* at 620 (quoting N.C.G.S. § 1285 (1883)). *Id.* Given this distinction, the North Carolina court concluded that "live in adultery" requires a showing of something more than "commit adultery," or a single act of adultery. *Id.* at 620–21.

In *Goodwin v. Owen*, 55 Ind. 243, 249 (1876), the Indiana Supreme Court interpreted a statute similar to that in this case and held, "Living in adultery means living in the practice of adultery. In this case, the evidence shows that she was living in the continuous practice of open adultery. If it does not show a living by her in open adultery, it will be difficult to find a case of such living." And similarly, in *Gaylor v. McHenry*, 15 Ind. 383, 385 (1860), the Indiana Supreme Court stated, "While it is true that a single act would make the plaintiff an adulteress, it does not follow, we think, that, of course, she would be living in adultery." The *Gaylor* Court went on, "If the law makers had intended that the commission of that single crime should bar the right to a distributive share in the estate, it certainly could have been expressed in fewer words and more pointed style." *Id.* By holding the phrase "lives in adultery" requires more than one act of adultery, this Court acts in accordance not only with our own jurisprudence and the intention of the General Assembly, but also in accordance with other states that have considered the same issue.

■ Finally, we address Griffin's argument that while Kathy may have only engaged in adultery on one occasion prior to Curtis's death, her conduct subsequent to his death establishes that she had commenced "living in adultery" and but for Curtis's untimely death she would most assuredly have forfeited her right and interest to his estate. This novel argument depends in part on Griffin's contention that Kathy's conduct in the weeks and months following Curtis's death is relevant. As a matter of law, it simply is not. Adultery is commonly defined as "voluntary sexual intercourse between a married person and a partner other than the lawful spouse." *Webster's II New College Dictionary* (1995). See also *Black's Law Dictionary* (9th ed.2009) ("adultery, *n.* Voluntary sexual intercourse between a married person and someone other than the person's spouse.") When Curtis died on September 12, 2004, Kathy became a widow and no longer had a "lawful spouse" against whom she could commit adultery. Stated simply, a surviving wife or husband cannot commit adultery against a deceased spouse because the marriage ends with the death of either party. Thus, the conduct of a widow or widower in the days, weeks or months following a spouse's death may be unseemly but it cannot be adultery. Griffin's contention that Kathy's one act of adultery at the inception of what became a longer relationship during her widowhood is sufficient to invoke the bar to an interest in Curtis's estate under KRS 392.090(2) is simply unavailing. To forfeit an interest in the other spouse's estate, the surviving wife or husband must have lived in adultery prior to that spouse's death.

■ The dissent's claim [8] that the majority opinion requires the Court to delve into the parties' sexual conduct to count out instances of infidelity is simply wrong. The statutory language "lives in adultery" requires more than one act of adultery by the offending spouse. In construing that

---

8. This discussion pertains to Justice Cunningham's dissenting opinion. The points raised in Justice Noble's dissent are largely addressed in the course of this opinion.

language, we do not require trial courts to tally acts of infidelity to a magical number, but rather we direct courts to look for a course of notorious or sustained unfaithful conduct or periodic or recurring adulterous activity by the errant spouse, which indicates he or she is *living* in adultery, as required by KRS 392.090(2). As for scrutinizing sexual conduct, it is the dissent's position that would encourage surviving family members to delve into the details of a separated couple's personal lives to search for that one "triggering" act of adultery that would change the beneficiary of the estate. In any event, this Court's job is to interpret the language of the statute, not to make impassioned judgment calls on the state of a particular marriage or the morality of the parties' conduct. The dissent also conveniently ignores the legislative history and accompanying judicial precedent, which indicate the General Assembly's understanding of the phrase "lives in adultery" and the import of using that phrase in KRS 392.090(2). If the General Assembly wanted to bar a spouse from participating in his or her deceased spouse's estate on the basis of one act of adultery, it certainly could have done so, just as it made that distinction before in the divorce context—although then the stringent one adulterous act requirement only applied to women. However strongly the dissent may disagree with the application of the law in this case, the General Assembly specifically chose the phrase "*lives* in adultery" as the standard in KRS 392.090(2)—this time applying it for estate purposes to both men and women—and that standard simply was not met in this case.

### CONCLUSION

Under KRS 392.090(2) a husband or wife is barred from participating in his or her spouse's estate when he or she voluntarily leaves the other and "lives in adultery." The phrase "lives in adultery" requires a showing of more than one instance of adultery. While the adulterous activity need not be with the same man or woman, it must be periodic or recurring, a sustained or notorious activity. Because the proof in this case shows Kathy engaged in adultery only once before her husband's death, the statutory requirement is not met and Kathy is not barred from her rights to and interest in her husband's estate and property. We therefore affirm the opinion of the Court of Appeals, reverse the ruling of the Harlan Circuit Court and remand this matter for proceedings consistent with this Opinion.

MINTON, C.J.; SCHRODER, and VENTERS, JJ. concur. CUNNINGHAM, J., dissents by separate opinion. NOBLE, J., dissents by separate opinion in which CUNNINGHAM and SCOTT, JJ., join.

CUNNINGHAM, J., dissenting:

This case presents one simple issue. Who gets the workers' compensation money from the estate of the dead Curtis Rice—the loving, nurturing mother of the deceased or the adulterous and absent wife?

The majority opinion today projects this Court into the sordid business of deciding how many times a person must have sex outside of marriage before deemed to be "living in adultery." In doing so, we place more emphasis on the sex than the marriage. We are also losing sight of the real purpose of the statute. This Court should not have to continually review the sex lives of married couples in order to determine how many acts of infidelity constitutes a death sentence to the marriage.

On September 12, 2004, thirty-year-old Curtis Rice was tragically killed when struck by a piece of steel at his place of

employment. Curtis was fighting drug addiction, working double shifts, and living with his mother, Jackie Griffin. As a mother, she had suffered through his addiction, once attempting to get a court order to have him committed to a rehab center. At the time of his death, it looked like Curtis had finally turned the corner. His meager estate—other than the workers' compensation award—was made up of a few junk cars and some personal property, amounting to about $1,000.

Young Curtis had been married for four short months to Kathy Rice. At the time of his death, he and Kathy had been living separate and apart for over three months. Divorce papers had been filed. Kathy had obtained an order to keep Curtis away from her. There were no plans by either party for reconciliation. The trial court found that, on the night before the death of Curtis, Kathy committed adultery with Bill Halcomb. She had been dating Halcomb for some time and began living with him after Curtis's death. After the death of her estranged husband, according to Appellant's brief, Kathy made claim to the $60,000 workers' compensation death benefit.

The statute was enacted for cases like this one. In reality, the two were irreconcilably separated. There was no marriage and all that was left was the signing of the paperwork.

I respectfully take issue with the majority's assumption that the 1889 case of *Goss* "indicates that one instance of adultery is insufficient under the statute," and that "there must be more than one instance of adultery for a husband or wife to 'live in adultery' under KRS 392.090(2)." This seems to be a total reconstruction of what the case actually states. Said our state's highest Court in *Goss* over 120 years ago:

This statute does not mean that she shall constantly live with one man in adultery during her *abandonment* of the husband, in order to forfeit her right of dower or distributable share; but if she admits any man or men to her periodically, *or whenever it is convenient or opportunity is afforded, during said abandonment,* such conduct constitutes a living in adultery, within the meaning of the statute, (Emphasis added.)

*Goss v. Froman,* 89 Ky. 329, 12 S.W. 387, 390 (1889). One time clearly may be the only time that it is either "convenient" or "opportunity is afforded."

What about a spouse who lives with another partner for five years, but only has a sexual relationship once because of physical disability or disease of one of the parties? Or the woman who has sex with a man one time before they are separated by war for many years, yet maintains a torrid correspondence with him during an uninterrupted absence from her spouse? Or an errant spouse who continues to live with her paramour when sexual relations cease after one time because of religious, psychological, or emotional issues? Only the imagination limits the myriad of situations which this Court may be called upon to decide.

Do we really want to?

The key word in *Goss* is not adultery, but abandonment. The trial court has fashioned a reasonable and workable interpretation of the statute which carries out its exact purpose. The act of adultery is simply the triggering device. The emphasis is placed on the "living." Are the two "living" as a married couple or has the marriage been abandoned?

Let's be sensible. The determination of whether a person is "living in adultery" must be left to the trial court to be determined by the totality of the circumstances. That includes the numerous factors which Judge Payne considered in this case. The

trial court has provided a workable standard for this thorny statute. First, the court must find the triggering event of at least one act of adultery. Secondly, the court must determine under the totality of the circumstances whether one party has abandoned the other and the two exist in basically a non-marriage.

Justice Abramson has herself spoken to the lethal impact of adultery upon a marriage in our case of *J.N.R. v. O'Reilly*, 264 S.W.3d 587, 603 (Ky.2008). In her reflective and well-measured dissent, she said that the *"marital relationship* on which our society is based *ceased* when that third party entered the picture." Intent of the parties determined from the totality of the circumstances becomes the major factor—not the sex act.

The factual determination of the trial court should be reviewed under an abuse of discretion standard. *Liberty National Bank & Trust Co. v. Kummert*, 305 Ky. 769, 205 S.W.2d 342 (1947). Under the facts of this case, it surely cannot be concluded that the trial court was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Sexton v. Sexton*, 125 S.W.3d 258, 273 (Ky.2004).

One finding of the trial court is conveniently overlooked by the majority. The trial court noted that Kathy Rice had a child less than nine months after the death of Curtis. The child did not belong to Billy Halcomb. So, was it one act of adultery or two? There we go counting again. It really makes no difference. Once was enough for this broken marriage.

The majority's attempted use of foreign state authority is unconvincing. The acient1825 Virginia *Stegall* case simply upheld the evidence as supporting an "open state of adultery." Likewise, the 1876 Indiana *Goodwin* decision only held that the evidence was sufficient to support the finding that the adulterous wife was "living

in the practice of adultery." Neither of these cases established a minimum threshold for adultery nor did they decree that one time is not enough. The only case of this century cited by the majority is the North Carolina decision in *Estate of Montgomery*, It is clearly distinguishable. In that case, the parties lived together for three years and had a child. That court said that summary judgment for the widow was in order because there was no proof that she committed even one act of adultery. ("Indeed, the evidence fails to raise a genuine issue of material fact regarding whether Respondent committed *any* acts of adultery." *In re Estate of Montgomery*, 137 N.C.App. 564, 528 S.E.2d 618, 621 (2000)).

I would hope that this Court, reputedly in last place for setting the pace for other state supreme courts to follow, would lead the way in giving modern guidance to this ancient and ambiguous statute.

Lastly, I respectfully submit that the majority misses the point of the relevancy of the post-mortem sexual behavior of Kathy Rice. I'm speaking of the relevancy of Kathy Rice continuing the sexual relationship with Bill Halcomb for eight to nine months after the death of her husband. It begs the point to say that the act of adultery cannot be committed against a dead spouse. Of course that is true. But there has always been an expected interval of decent "grieving" when one spouse dies before sleeping with another man or woman—at least in cases where there was still a marriage in fact and not just in law. The seamless continuation of Kathy's relationship with Halcomb after her act of adultery and the sudden and tragic death of her young husband is probative evidence as to her state of mind toward her marriage to Curtis at the time of his death. It is further proof that there was no sacred bond of marriage between the two which

would entitle her to the benefits of the statute.

The purpose of KRS 392.090(2) is not to punish. It is not even intended to give rise to a cause of action, as adultery was in the pre-no fault divorce days. The statute deals with pure equity, not marital discord or termination. The clear intention is to preclude delinquent spouses, with unclean hands and who have totally abandoned the marital bed, to return at the graveside of their wronged husbands or wives and unjustly enrich themselves because of a relationship long-time spurned. Future generations of this Court will lament we did not affirm the trial court and fashion a decision here today which would have spared them the role of forever counting sexual trysts of partners to a dead marriage. And we must now turn to the mother of young Curtis Rice and tell her that the state's highest Court simply did not think her departed son had been cuckolded enough. Maybe a couple more times would have done it.

I respectfully dissent.

NOBLE, J., dissenting:

I do not disagree with the majority that KRS 392.090(2) requires more than a single act of adultery, *standing alone*, to create the forfeiture of the adulterer's right to inherit from his or her spouse's estate. The language in the statute requires that the adulterous spouse "lives in adultery," language which implies that there must be something more than merely committing adultery. However, it is my view that a single act of adultery, *plus other relevant facts*, can constitute living in adultery. This view takes a "totality of the circumstances" approach that seems more reasonable to me than counting acts of adultery. It also requires a case-by-case analysis. As always, the trial court is in the best position to judge the facts of a case. Here, the trial court gave greater weight to the testimony of Billy Halcomb, who admitted to having sex with Kathy Rice the day before her husband, Curtis Rice, died. Halcomb described a dating relationship with Kathy that began two days prior to Curtis's death. He and Kathy went out together on Friday, and again on Saturday. The date on Saturday was to a bar, where he testified that they became intoxicated and later had sex. Further, the dating relationship *continued* after Curtis's death, and culminated in Billy and Kathy living together subsequent to Curtis's death for 8 or 9 months. While the continued relationship clearly could not be adulterous due to Curtis's death, it is nonetheless evidence of Kathy's intent when she began the relationship with Billy: an intent to *live in* a relationship with Billy that began before Curtis died and was definitively adulterous while he lived. Thus it appears that Kathy began the relationship with the intent of living in adultery with Billy, and in fact did so for two days.

While adultery has been legally defined as requiring sexual congress,[9] clearly a sexual act alone is not the extent of living in adultery. There must also be a knowing abandonment of the marital relationship. Here, the trial court knew that Kathy had filed for divorce six months after the marriage, and the parties were living

9. *See, e.g.,* Black's Law Dictionary 56 (8th ed. 2004) ("Voluntary sexual act between a married person and someone other than the person's spouse."); *see also Baker v. Baker,* 136 Ky. 617, 124 S.W. 866, 867 (1910) ("[A] man so lost to all sense of decency as to openly consort with **harlots** on the streets of a populous city and to be frequently seen with them in a house of ill fame, and there availing himself of the usual means and opportunities for sexual intercourse with them, will be presumed to have given free rein to his lustful propensities, and to have committed the act of **adultery** with each opportunity.").

apart. In fact, the marriage had only lasted seven months on the date of Curtis's death. During that time, Kathy had filed for domestic violence protection, which banned Curtis from going around her. Nonetheless, she remained a married woman, and when she chose to date prior to obtaining her divorce, she manifested clear intent not to "hold herself only unto Curtis." By beginning a dating relationship with another man and having sex with him while still married to Curtis, she *was* living in adultery. It is a matter of happenstance that she only did so briefly.

Further, this Court is required to give deference to the fact-finding of the trial court. I cannot say Judge Payne was clearly erroneous in his findings regarding the facts of this case. Nor do I agree that he misapplied the law. Instead, he did a totality of the evidentiary circumstances analysis that I doubt even any lay person would have a problem understanding. I believe the majority analysis is too focused on the *number* of times sex occurred rather than how it came about and what the adulterer's intent was, and thus reads the statute in such a strict and counter-intuitive way as to risk gutting the intent of the statute.

That said, I do question whether a statute such as this serves a sound public policy in today's world. Divorce is now no-fault, and an act of adultery is not the necessary death knell of a marriage formerly required in fault-based law. Thus unless this statute is viewed as having some fault base to the extent of at least examining the adulterous party's intentions, there is little reason to still have it on the books.

CUNNINGHAM and SCOTT, JJ., join.